IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FRANK CURTIS MALIER and )
Wife, MARY ANN MALIER, )
)  CASE NO. 3:11-00091
Plaintiffs, )  JUDGE HAYNES
)
v. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

# MEMORANDUM

Plaintiffs, Frank Curtis Malier and Mary Ann Malier, his wife filed this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., against the United States. Plaintiff Frank Malier asserts a medical malpractice claim arising from a nurse at a Veteran's Administration ("VA") hospital in Nashville, Tennessee providing Plaintiff Frank Malier with medications intended for another patient at the VA hospital. Plaintiff, Mary Ann Malier, asserts claims for loss of consortium and services.

Before the Court is the United States's motion to dismiss for lack of subject matter jurisdiction (Docket Entry No. 20) under Fed. R. Civ. P. 12(b)(1) contending that the Government has not waived its sovereign immunity under the FTCA where, as here, Plaintiffs' claims are based upon acts of an employee of Medical Staffing Network ("MSN"), the Government's independent contractor that provides medical personnel to provide health care services to patients at the VA's Nashville hospital employee.

In their response, Plaintiffs cited the testimony of the VA's nurse manager and the charge nurse as proving that the nurse at issue was under the direct supervision, control and

1

management of the VA's nurses at this VA hospital. Thus, the Plaintiffs contend that nurse at issue was an agent of the United States subject to the FTCA.

### 1. Review of the Record

According to the complaint, Plaintiff Frank Malier was a patient at the Nashville VA hospital on February 7, 2009 for surgery for a bleeding ulcer. (Docket Entry No. 1, Complaint at ¶ 3). Frank Malier, however, was transferred to the VA hospital's intensive care unit ("ICU") until after he received medications from a nurse that was prescribed for another patient at the VA hospital. Id.

The United States submits the affidavits of Brittany Ross, a registered nurse and VA hospital employee and Kerri Craft, a registered nurse and nurse manager at this VA hospital. (Docket Entry No. 23, Ross Affidavit and Docket Entry No.24, Craft Affidavit). Ross was the charge nurse for Frank Malier's floor at the time of the events at issue. Ross states that several independent contractors provide health care workers who are employees of the independent contractor. (Docket Entry No. 23, Ross Affidavit at ¶¶ 1, 2). For the Malier incident, Kassidy Wilkinson, a nurse and MSN employee was among the nurses on duty on Malier's floor. Id.

According to Ross, "at approximately 8:30 a.m. on February 12, 2009, Wilkinson came to her in tears and stated that she had given the wrong medication to ... Mr. Malier" that was blood pressure medication prescribed for Malier's roommate at the VA hospital. Id. at ¶ 3. Ross immediately went with Wilkinson to Malier's room and found Frank Malier stable, but with a lowered blood pressure. Id. Ross transferred Malier to the ICU. Id. Ross reported the incident to Kerri Craft, the VA nurse manger and attending physicians. Id. at 4. After she received Ross's report, Craft examined Malier in ICU and the chief of nursing directed Craft to inform

2

Wilkinson that her services would no longer be needed. (Docket Entry No. 24, Craft Affidavit at ¶¶ 3-4).

Craft also discussed this incident with Wilkinson who explained that she failed to follow the VA's hospital's Bar code Medication Administration ("BCMA") procedure. Id. at ¶ 4. The BCMA is a VA protocol that places a bar code on each patient's wrist bracelet and this bracelet must be scanned before any medication is administered to the patient. Id. During her orientation at the VA hospital, Wilkinson received training on this VA protocol. Id. Prior to this incident, Wilkinson did not have any work performance issues. Id. at ¶ 2.

Craft then told Wilkinson, that MSN, Wilkinson's employer, would handle any discipline for this incident, but that her services would no longer be needed by the VA. Id. at ¶ 4. In response, Wilkinson cried and was remorseful. Id. Craft contacted MSN, the VA's contractor to report this incident. Id. at ¶ 5. The MSN representative assured Craft that Wilkinson would not return to work at the VA hospital again. Id.

Plaintiffs' cites portions of Craft's deposition that describes her duties as nurse manager at the VA hospital. Plaintiffs contend this proof establishes that Wilkinson's work at the VA hospital and the nurse management structure was controlled by VA employees.

> Q: Give me a sense of what your duties are as a Nurse Manager.
>
> A: My duties as a Nurse Manager are to oversee the care provided on Three North. I complete payroll. I have multiple monitors that I submit to my Chief Nurse. I put out fires daily.
>
> Q: Okay. I know a little bit about that. And who then is your supervisor?
>
> A: My current supervisor is Mary Kelly McCullough.
>
> Q: And what is her job title?

A: She is the Chief Nurse.

Q: Is that the Chief Nurse on that floor?

A: No, she is the Chief Nurse of the Nashville Campus.

* * *

Q: Okay. So is the Chief Nurse then an employee of the Veterans Administration?

A: Yes, sir.

* * *

Q: There are nurses, I understand, that are working - or let's, I guess, speak about February of 2009 because I believe you were the -you were a Nurse Manager then as well?

A: Yes, sir.

Q: There were at that time nurses that were involved on the Third Floor that were not employees of the Veterans Administration; is that correct?

A: Yes, sir.

* * *

Q: Okay. So I guess you have an independent memory of the events that occurred involving Mr. Malier?

A: I do, yes, sir.

Q: At that time, do you know how many nurses there were on Third Floor that was not VA employees?

A: There were approximately - I'll have to think. Approximately five that I can recall.

Q: Do you know, were all of them nurses that were provided by the Medical Staffing Network?

A: Yes, sir.

* * *

4

Q: Had they been providing staff - nurses for the period of time that you were working as the Nurse Manager?

A: Yes Sir.

* * *

Q: So as I'm understanding it then, the chain of command sort of at that time would be the Chief Nurse, and who was that in 2009?

A: Margaret Eaton.

* * *

A: She has retired.

Q: But in February of 2009, she was the Chief Nurse?

A: Yes, sir.

Q: And then under the Chief Nurse would be the Nursing Managers which you were?

A: Yes, sir.

Q: And there were three, four, five, six, seven of those in 2009?

A: Yes, sir.

Q: And is it fair to say then that as the Nurse Manager you were in charge of all of the nurses that were on your floor?

A: Yes, sir.

Q: And on each floor there is a nurse that is designated as a Charge Nurse, too, isn't there?

A: Yes.

* * *

Q: ... And what is the responsibility of the Charge Nurse?

A: They delegate workload based on acuity and skill level of the staff

for that shift. They verify physician orders and ensure they're carried out. They resolve issues that they're - that they can resolve at that level. If not, they come to me.

* * *

Q: Did the MSN, or Medical Staffing Network, did they provide registered nurses?

A: No, sir.

Q: All of the nurses that they provided would either be licensed practical nurses or nursing assistants?

A Yes, sir.

Q: And so the - we know, I believe, Ms. Kassidy Wilkinson was a nurse that was being provided at that time by the Medical Staffing Network?

A: Yes, sir.

Q: And Ms. Wilkinson, I believe, was an LPN?

A: Yes, sir.

Q: Okay. And is then the Chief Nurse then the supervisor over all of the Nurse Managers?

A: Yes, sir.

Q: And so her direct immediate supervisor would have been whoever the Charge Nurse was?

A Yes, sir.

Q: And that's Brittney Ross? That was Brittney Ross at the time that incident occurred?

A: Yes, sir.

Q: What was the role then of the LPNs on that floor at that time?

A: The role of the LPN was to provide daily care to the patient.

6

Q: Okay.

A: General nursing based on the needs of the patient.

Q: Okay.

A: Medication administration.

Q: Okay.

A: Documentation.

(Docket Entry No. 27, Plaintiff's Response in Opposition to Motion to Dismiss at 3-4, 6, quoting Craft Deposition at 5. 6. 7. 8, 11, 12, 14-15).

As to the interrelationship between the VA nurses and the government contractor nurses, Craft testified as follows:

Q: Would it be the Charge Nurse then that would be given the responsibility of giving the LPNs their job duties on each shift?

A: They assign patient -they assign the patient load; however, the job duties are for all LPNs, it remains the same. You will provide general nursing care based on the needs of that patient.

Q: Okay. So if they have any - if the LPNs have any particular needs, their role is then to go to the Charge Nurse?

A: Yes, sir.

Q: And it's the Charge Nurse's responsibility to supervise the LPNs in their administration of their duties?

A: Yes, sir.

\* \* \*

Q: Did you as a Nursing Manager have the ability as the Nursing Manager to hire employees?

A: Yes, sir.

7

Q: Did each of the employees that were to be hired, did they go through you as a Nursing Manager?

A: VA employees, yes, sir.

\* \* \*

Q: Did you have the authority as the Nursing Manger to dismiss LPNs?

A: I didn't have the authority to dismiss; however, based on my feedback to the Chief Nurse, the Chief Nurse would dismiss based on my feedback.

\* \* \*

A: She - based on if there was an issue with a contract nurse, there would have to be documentation of it to support it. We'd give that documentation to the Chief Nurse. And then the Chief Nurse would notify the contract agency that their services would no longer be required and this is why, and provide them the documentation.

Q: Okay. So the concept then of cancelling the services of the case, what you're calling the contract nurses, is a responsibility that would have been that of the Chief Nurse?

A: Yes, sir.

Q: And she had - or he or she –

A: Uh-huh.

Q: -- had the authority to dismiss the contract nurses?

A: Yes, sir.

\* \* \*

Q: Was it the Chief Nurse then, did the Chief Nurse have the authority to suspend or dismiss the contract nurses?

A: They had the authority to tell the - the contract that the particular nurse, her services would no longer be utilized by the VA.

Q: Okay.

A: The response- then after that, it was to the con- it was up to the contracting agency.

Q: To deal with the nurse whose services were no longer needed?

A: Yes.

Q: Who is the individual that would be charged with the responsibility of assuring that the contract nurses were doing their work properly?

A: That would be me.

Q: Okay. And if you had a problem with a contract nurse, would you go to that nurse or would you go to your supervisor, the Chief Nurse?

A: If I recognized a problem, I would go to my Chief Nurse with the problem.

\* \* \*

Q: Okay. Did the contract nurses at that time come to you for assistance in any way as a Nurse Manager?

A: If they needed assistance at the leveii could provide, yes, sir.

\* \* \*

Q: Did you as the Nursing Manager have the authority to assure that the LPNs were conducting their responsibilities within the standards as required by the Veterans Administration?

A: That wouldn't take authority to - we're also held to an ethical scope of practice and standards of conduct by our nursing license.

Q: I understand that. Was it your responsibility to make sure that? was carried out?

A: Yes, sir.

\* \* \*

Q: The statement of competency is something that you as the Nurse Manager would prepare for each employee's file?

9

A: Yes, sir.

Q: And that's done on an annual basis?

A: Yes, sir.

Q: And that would be done on each of the nurses on your floor?

A: Yes, sir.

Q: Including the contract nurses?

A: Yes, sir.

Q: And so to that extent, it would involve some sort of annual evaluation of the nurses, would it not?

A: We- we have an annual skill competency evaluation.

Q: Okay. And that's conducted by you as the Nurse Manager?

A: It - it's - I ultimately sign off; however, we have instructors, various instructors, throughout the hospital.

Q: That participates in the nursing competency evaluation?

A: Yes, sir.

(Docket Entry No. 27 at 7-9, quoting Craft deposition at 14, 15, 16, 17, 18, 19, 41, 42)

Plaintiffs also cite the deposition testimony of Ross, the charge nurse on Plaintiff Frank Malier's floor in February 2009 as proof that VA officials controlled Wilkinson's work at the VA hospital.

Q: And I've been informed by Ms. Craft that you were the Charge Nurse in February of 2009.

A: Yes, sir.

Q: And you were the Charge Nurse on the Third Floor at the time of the incident that occurred to Mr. Frank C. Malier?

10

A: Uh-huh.

Q: Is that a yes?

A: Yes. I'm sorry, yes.

* * *

Q: Tell me, if you would, please, your understanding of what your role as a Charge Nurse was at that time.

A: Based on the number of nurses that we have that day and the number of patients we have on that ward that day, **I do a nurse/patient ratio based on patient acuity, their acuity level, the nursing skill level of that nurse, specific nurse, and give them each assignments. I take physician orders off and give them to each nurse. Check crash cart daily. Make sure there are no missed medications. Give that to each nurse. Make sure that all medi - pain medi -we call them prn, as-needed medications, are - we go back to the patient to make sure that the medication fixed their problem, make sure all of that is put in the computer. Make sure all documentation is correct and done.**

Q: Okay. So you are- you oversee then the work of the nurses on the floor?

A: Yes, sir.

Q: **If there is a physician order that is given, it is your responsibility to make sure that those orders are carried out?**

A: It's my responsibility to give it to that nurse.

* * *

A: **...I said previously that I looked at missed medications, if there was a medication missed, I go to that nurse and say this medication was missed.**

* * *

Q: How would you determine - as a Charge Nurse on the Third Floor, how would you determine that the physician orders were carried out? Would you as the Charge Nurse personally review the physician orders –

A: Yes.

Q: --on each patient?

11

A: Uh-huh.

Q: I'm sorry, yes?

A: Yes.

Q: And would you review those orders with the nurses on the floor?

A: I would give them a printed out copy of the order, hand it to them.

Q: And how would you as the Charge Nurse be assured that those orders were being carried out and performed properly?

A: I mean, I -one thing would be as far as the missed medications, there's new medication orders put in all the time. I would review the missed- if there's any missed medications, not given, I would know about it. Physicians could come up to me and tell me this was not done. I would go to that nurse and notify them about it. I mean, I can't go around each nurse and make sure they're doing their job. That's not - it's pretty much someone coming up to me and telling me this was not done so I would take appropriate action to see that –

Q: Okay.

A: -- the job was done.

Q: So you wouldn't at the end of the shift review the orders on each of the patients to make sure that those orders had been carried out?

A: No.

Q: But if someone came to you and said that my doctor's orders are not being carried out, it would be your responsibility to go to the nurse and make sure that they were, in fact, carried out?

A: Yes.

Q: And it wouldn't matter whether that nurse was a VA nurse or whether it was contract nurse, your-

A: No, sir.

Q: --you role would be the same?

A: Right.

> Q: And, likewise, I gather, Ms. Ross, that if a nurse on the floor experienced a problem, they would go to you as the Charge - as the Charge Nurse?
>
> A: Yes, sir.

(Docket Entry No. 27 at 9-11 quoting Ross deposition at 4, 7, 8, 9) (emphasis added).

The United States quotes portions of its contract (Docket Entry No. 31-3 at 1, 2, 5 and 9) that Wilkinson is not a VA employee. Yet, the contract must reviewed in the context of Wilkinson's actual work.

### B. Conclusions of Law

For a jurisdictional challenge under Fed. R. Civ. P 12(b)(1), Plaintiffs bear the burden of proving sufficient facts to support subject matter jurisdiction. Madison-Hughes v. Shalala, 80 F.3d 1121, 1130 (6th Cir. 1996); United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). For a factual jurisdictional challenge, the Court must resolve any factual disputes. Rogers v. Stratton Indus., Inc., 78 F.3d 913, 915 (6th Cir. 1986).

With the enactment of the FTCA, Congress created a limited waiver of the United States's sovereign immunity from claims, with certain exceptions. United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Sherwood, 312 U.S. 584, 586 (1941). Here, the pertinent exception under the FTCA is the independent contractor exception. See 28 U.S.C. § 2671. Under this exception, the United States retains its sovereign immunity against any claim based upon the acts or omissions of a government contractor's employee over whom the United States lacks "the power ... to control the detailed physical performance of the contract." United States v. Orleans, 425 U.S. 807, 815 (1976) (quoting Logue v. United States, 412 U.S. 521, 528 (1973).

In <u>Orleans</u>, the Supreme Court discussed the rationale of the government contractor exception to the FTCA.

> The Federal Tort Claims Act is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment. The Tort Claims Act was never intended, and has not been construed by this Court, to reach employees or agents of all federally funded programs that confer benefits on people. The language of 28 U.S.C. s 1346(b) is unambiguous, covering injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." The Act defines Government employees to include [officers and employees of "any federal agency" but excludes "any contractor with the United States." 28 U.S.C. s 2671.] Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver. See <u>Dalehite v. United States</u>, 346 U.S. 15, 30-31, 73 S.Ct. 956, 965, 97 L.Ed. 1427, 1437-1438 (1953). **A critical element in distinguishing an agency from a contractor is the power of the Federal Government "to control the detailed physical performance of the contractor."** <u>Logue v. United States</u>, 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121, 128 (1973).
>
> In <u>Logue</u> this Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal employees or employees of a federal agency; thus, the United States was not liable for their torts. **Although the contract required the county jail to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees. In short it could take action to compel compliance with federal standards, but it did not supervise operations.** In <u>Maryland v. United States</u>, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965), this Court held that civilian caretakers of Air National Guard aircraft assigned to the National Guard, but owned by the United States, were state, not federal, employees although the caretakers were paid from federal funds and required to comply with federal standards. In <u>Logue</u> we noted that one of the factors which the Court in <u>Maryland v. United States</u> relied upon was the state supervision of the relevant military and civilian personnel. Thus, as in <u>Logue</u> and <u>Maryland</u> **the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.**

425 U.S. at 813-15 (emphasis added with footnotes omitted).

From the Court's review and based upon the "day-to-day operations" standard in <u>Orleans</u>, the controlling facts here are that the VA hospital developed the medication protocol that controlled the method of prescribing medication for patients at this VA hospital. The VA hospital trained Wilkinson on that protocol. A VA nurse supervised the specific details of Wilkinson's work as a nurse at the VA hospital by setting the ratio of Wilkinson's patients, assessing the patient's acuity, determining each nurse's ability and assigning nurses specific patients. Craft, the VA nurse manager, made the first and critical decision that Wilkinson would no longer work at the VA's Nashville hospital. The Court deems this factual showing sufficient to find that the VA hospital official "supervised the day to day operations" that gave rise to Plaintiff Frank Malier's claim.

Thus, for jurisdictional purposes, the Court concludes that Plaintiffs have satisfied their burden of proof that this Court possess jurisdiction over Plaintiffs' claims under the FTCA. This jurisdictional finding does not preclude a jury's finding that Wilkinson was the employee of a Government independent contractor.

Accordingly, the Court concludes that the United States's motion to dismiss for lack of jurisdiction (Docket Entry No. 20) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 24th day of October, 2011.

William J. Haynes, Jr.
United States District Judge